IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

MAR 2 0 2008

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

JIMMIE HINELY,

      Plaintiff,

v.

      Civil Action No. 1:07 CV 64

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

## OPINION, REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Jimmie Hinely ("Plaintiff") filed applications for DIB and SSI on May 28, 1998, alleging disability as of January 1, 1997. Plaintiff last met the insured status requirements of the Act on September 30, 1998. The applications were denied initially and on reconsideration. Upon review, Administrative Law Judge ("ALJ") Karl Alexander remanded the claim to the State agency for consideration of Plaintiff's alleged mental impairments. Upon further review, the State agency again denied Plaintiff's claim. Plaintiff requested a hearing, which was held on October 30, 2001, by ALJ

Edward J. Banas. Plaintiff, represented by counsel, testified, along with Medical Expert Ray Clark and Vocational Expert James Ganoe ("VE"). The ALJ rendered a decision on March 6, 2001, finding Plaintiff was disabled for SSI purposes as of June 1, 2000, but was not disabled at any time prior to that date. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Plaintiff sought judicial review in the United States District Court for the Northern District of West Virginia. A Report and Recommendation was issued by the undersigned Magistrate Judge dated January 31, 2005. R. 869-891. In that Report and Recommendation, the undersigned recommended "that Defendant's Motion for Summary Judgment be **DENIED**, that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED IN PART**, by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation for Disposition."

In the body of the Report and Recommendation, the undersigned made the following specific findings:

1)      Dr. Clark's Testimony

"The undersigned therefore finds substantial evidence supports the ALJ's determination, based on Dr. Clark's testimony, that Plaintiff's mental impairments "rose to a more severe level" as of June 1, 2000, and that they were not disabling before that date."

2)      Back Impairments

"The undersigned finds, however, that the ALJ did discuss all of these findings, and that, therefore, his referring to all of Plaintiff's back impairments collectively as "back pathology" is not reversible error."

3)      Shoulder, knee, carpal tunnel syndrome and lower extremity neuropathy.

"Because the ALJ did not explain his reasoning in not finding Plaintiff's shoulder and knee impairments, carpal tunnel syndrome or lower extremity neuropathy severe, the undersigned cannot find that substantial evidence supports his decision."

4)      RFC and Hypothetical Questions to VE

"Because the ALJ did not fully discuss Plaintiff's shoulder, knee, wrist, and lower extremity impairments, the undersigned cannot find that substantial evidence supports his RFC assessment or his hypothetical to the VE."

5)      Credibility Analysis

"The undersigned finds the ALJ did not expressly make the threshold finding that Plaintiff did or did not have medically determinable impairments which could reasonably be expected to cause the pain Plaintiff alleges he suffers.  Instead, he "proceeded directly to considering the credibility of [Plaintiff's] subjective allegations of pain." *Craig, supra,* at 596.  Further, the undersigned also finds the ALJ did not take into account all of the factors to be considered at the second step of the credibility analysis under *Craig.*  His analysis at step two of the credibility evaluation is therefore also insufficient."  R. 869-891.

On September 28, 2005 The District Judge entered an order adopting the Report and Recommendation in whole and remanding the case to "Commissioner of Social Security pursuant to the fourth sentence of 42 USC §405(g) for a determination of whether the Plaintiff was disabled at any time [at any time] between January 1, 1997, and June 1, 2000.  R. 892-894.

No appeal of the District Judge's Order was taken.

On October 28, 2005, the Appeals Council vacated the final decision of the Commissioner

of Social Security and remanded the matter to an Administrative Law Judge "for further proceedings consistent with the order of the Court." R. 898.

Plaintiff construed the sole issue on remand to be whether Mr. Hinely was disabled at any time prior to June 1, 2000. R. 1015.

A hearing was held on February 9, 2006 in Bridgeport, West Virginia. Mr. Hinely was represented by counsel, Montie Van Nostrand. In addition, Mr. Larry Bell, a vocational expert was present and offered testimony. R. 1184-1207. The ALJ declined to call a medical expert for the second hearing. After the hearing, ALJ Karl Alexander found by decision dated April 6, 2006 that Mr. Hinely was not disabled at any time between January 1, 1997 and May 31, 2000. R. 837 - 849.

The decision of the ALJ was affirmed by the Appeals Council making the ALJ's decision the final decision of the Commissioner. R. 822- 825.

It is that decision which is now pending review by this Court.

## II. Statement of Facts[1]

Jimmie Hinely ("Plaintiff") was born on December 21, 1958, and was 47+ years old at the time of the 2006 Administrative Hearing. The transcript of the 2001 administrative hearing was filed as Exhibit 14 and made a part of the record in the 2006 case. According to the combined transcripts, as of 2001 Hinely was a 3 year resident of Cowen, West Virginia, living in an apartment with his 15 year old son. Prior to that, he resided in Gassaway, West Virginia for about a year. Prior

---

[1]Due to the convoluted history of this case and the piecemeal way in which the record was developed over the course of two administrative hearings and two appeals, including but not limited to numerous submissions post second hearing by Plaintiff's counsel, it was necessary to organize and do a synopsis of the voluminous record in chronological order in order to make sense of the what evidence was actually pertinent to the ALJ's consideration of the limited issues involved in the second hearing.

to living in Gassaway, Mr. Hinely moved around a lot. R. 760/933. He has a tenth grade education and obtained his GED. He obtained a certificate of completion of a 780 hour course in Auto Mechanics in 1983 through vocational rehabilitation. R. 1018. He was honorably discharged from the Army National Guard as a Private E-1 Engineer Detachment in February 1982. R. 1019. He describes his ability to read and do arithmetic as "passable." R. 761/934. He testified he was able to care for himself most of the time when he was alone at home while his son was at school and that he had a driver's license and did limited driving. R. 762/935.

His past relevant work experience includes work at a fish packing plant, in construction, as a mechanic, and as an equipment operator. R. 762-766/935-939. He had a number of employers between 1978 and 1996:

Tumbleston & Scott Transfer, Inc.
Ritchie Construction Co. Inc.
Chavis Moving & Storage of Charleston, Inc.
Ruscon Construction Co & ABCO Builders Inc PTR.
TG&Y Stores Co.
Sav-On Insulation Systems, Inc.
Ashley Transfer & Storage Co. Inc.
Dimare Johns Inland, Inc.
TG&Y Stores Co.
Lowes of South Carolina, Inc.
Ashley Transfer & Storage Co. Inc.
Brandex Temporary Service
Dimare Johns Inland, Inc.
Dept of the Army - Active Component La Petite Academy Inc.
Wendys of Charleston Inc.
TG&Y Stores Co.
DE Gressette Corp
Brandex Temporary Service
Hafco Inc.
Maloney Mfg Corp, Inc.
Better Roads Inc.
Jack M. Berry Grove Corporation
Scotty Bobcat Service Inc.
Sentry Guard Services of Florida

Albertsons Inc.
State Highway Department
Carr Exterminating Co Inc.
South Carolina Rentals Inc.
State Highway Department
William D. Owen
Stoller Chemical Company Inc.
Dimare Johns Island Inc.
Charleston Chemical Company
EH Management Inc.
Jerry L. Fowler/Fowler Land Surveying
Walterboro Veneer Co. Inc.
Stephen F. Young / Total Building Systems
Cold Spring Fish & Supply Co. Inc.
Action Appliance Rental Inc & Florida Rental Inc Ptr.  R. 57-63.

Hinley has not worked since 1996.  R. 763.  Mr. Hinely described himself as a "jack-of-all-trades-and-master-of-none."  R. 764/937.  Mr. Hinely testified during the first hearing that he started having troubles with his back in the latter part of 1996 while working at the fish packing place in New Jersey and he eventually quit that job and moved to West Virginia with his son and went on welfare.  R. 766-767/939-940.

During the first hearing, Hinely's counsel sought to have Hinely testify that he quit jobs or was fired from jobs because of emotional problems or disagreements on the job.  Hinely in response stated:  "Oh, I've quit lots of jobs because of just that, and I - - or I just didn't  - - plain just didn't like the job.  I've just had problems coping with all jobs, or - -."  When pressed by counsel about whether he had problems with co-workers or bosses, Hinely responded that on one occasion he got in a pushing argument when he was told to go out and collect money from people and he didn't think it was right.  He also stated: "I wouldn't need a reason.  I don't what to say, or how to, you know, what to do, or , just - - sometimes, I wouldn't need a reason, it was just like I would want to - - I was ready to go somewhere else, and I guess I would pick a reason to leave."  R. 771-774/944-947.

**Pre January 1, 1997 (Alleged Onset Date) Medical History**

In 1981, Plaintiff was admitted for in-patient psychiatric treatment. R. 100-102, 103-138, 142-145. He reported he had a long history of explosive outbursts and self-destructive behavior. He reported decreased appetite, sleep disturbance, agitation, and suicidal ideation. His judgment and insight were considered to be poor. He was diagnosed with an adjustment disorder with depressed mood and personality disorder with mixed features.

In 1982, Plaintiff suffered a blunt injury to the right knee with complaints of locking and pain. He subsequently underwent a right knee arthroscopy for torn retropatellar cartilage with grade II chondromalacia and torn cartilage of the femoral and medial tibial compartments. R. 155-172.

Mr. Hinely testified in his second hearing that he had suffered a low back injury in late 1982 or early 1983 which prevented him from working for a period of 11 months. R. 1191. Hinley's counsel explained that she was unable to get the medical records related to the low back injury from South Carolina Worker's Compensation. R. 1192. Hinely explained that he had 4 worker's compensation claim cases before his alleged onset date of January 1, 1997: Right Knee; Left Shoulder 1; Left Shoulder 2; and Low Back. R. 1192-1193.

Incident to his second hearing, Hinley submitted records dated September 24, 1991 of Charleston Memorial Hospital relative to his complaint of left foot pain due to children playing football and falling on his foot. X-rays revealed an "unremarkable left foot with no evidence of fracture." R. 1116-1119.

Incident to his second hearing, Hinely submitted the records of the Charleston Memorial Hospital relative to December 13, 1991 fall on his porch hitting against brick steps. X-rays reveal no evidence of rib fracture and no acute trauma to the chest. R.1114-1115.

Incident to his second hearing, Hinely also submitted a consultation note dated May 7, 1993

7

from Franklin C. Fetter Family Health Center reflecting he had been seen for left knee pain of two months duration by patient history and that he was seeking an orthopedic knee brace. R. 1168.

Incident to his second hearing, Hinely also submitted records of the Charleston Memorial Hospital relative to his July 14, 1993 x-ray of his right shoulder. The x-rays, taken because of his complaints of right shoulder pain, leg pain in both legs, and back pain due to falling through the floor in his bathroom, showed "no radiographic evidence of acute fracture or dislocation" and fail to demonstrate any [sic] demonstrate of bony or soft tissue injury" to the left knee, foot and ankle. R. 1100-1011, 1167.

Incident to his second hearing, Hinely submitted records of the Charleston Memorial Hospital relative to an August 17, 1993 to August 18,1993 admission for suicidal ideations, complaints of marital problems, expression of feelings of hopelessness, and wishing he was dead. The medical history in the admission notes reflects that at 17 years of age Hinely was hospitalized at the Medical University for his "temper". During his August 1993 stay, Hinely denied he intended to commit suicide and stated he had said that he wanted to commit suicide in order to manipulate the hospital to gain admission. He was discharged in a stable condition. R. 1120-1165.

Records submitted incident to his second hearing show Hinely had two arthroscopic surgeries on his right knee, the second having been performed in September 1994. After the surgeries, Dr. Merrill saw Hinely on more than one occasion with respect to his post surgical complaints. By report dated November 29, 1994 Dr. Merrill, Assistant Professor of Orthopaedic Surgery at the Medical University of South Carolina, noted Hinely's complaints of "some diffuse pain about the medial aspect" and "around the patella tendon region." Dr. Merrill noted "[o]n examination he has a negative Lachman's Test and there may be a very mild effusion. He has some tenderness around

his tibial tubercle and the medial joint." As a course of action, Dr. Merrill recommended a MRI or a "repeat arthroscopy if for nothing else to give him a clean bill of health." R. 1172. The recommended MRI was performed on November 23, 1994 and was read to show "[t]he posterior horn of the lateral meniscus has an abnormal morphology and shows abnormally increased signal. This is indicative of a tear of the posterior horn of the lateral meniscus. The posterior horn of the medial meniscus shows abnormal signal characteristics likely representing post surgical changes without evidence of a tear." The remainder of the knee was normal. Radiographs of the right knee showed "no evidence of fracture, dislocation, or significant joint effusion." R. 1173-1183.

Incident to his second hearing, Hinely also submitted records from the Medical University of South Carolina which show: by x-ray that on December 6, 1994: the cervical spine alignment was normal without evidence of fracture and the prevertebral[2] [sic] soft tissues were within normal limits; the left shoulder demonstrated no evidence of fracture or dislocation and the acromioclavicular joint was normal in appearance; and the left elbow demonstrated no evidence of fracture, dislocation or significant soft tissue abnormality. R. 1170-1171.

On April 1, 1996, Hinely underwent surgical anterior reconstruction of the left shoulder. R. 452-5101. Hinely is left handed. The history of this surgery indicates that Hinely underwent an arthroscopic procedure on the same shoulder in February 1996, and had a subacromial impingement preoperatively, and that at the time of the arthroscopic debridement he was noted to have anterior subluxation and subacromial impingement. He underwent subacromial decompression and arthroscopic glenohumeral debridement. After exercise he reported no significant relief and the

---

[2]Perivertebral meaning "around a vertebra." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

second surgery (April 1996) for reconstruction was performed.

**January 1, 1997 (Alleged Onset Date) Through June 1, 2000 (Disability Date) Medical History**

Hinely presented to the ER on January 7, 1997, for a closed head injury, left shoulder contusion, hypertension, laceration above the left eye, and possible left orbit blow out fracture after reportedly falling. R. 185. Cervical spine x-rays showed an anomaly of the C6 vertebra which appeared to be consistent with a spina bifida occulta as well as hypoplasia of the spinous process. R. 413-515.

In October 1997, Hinely began psychiatric treatment with psychologists Battisti and Steward. His presenting problems were anxiety and depression. Axis I diagnoses included general anxiety disorder, adjustment disorder, R/O ADHD and R/O intermittent explosive disorder. R. 228.

Dr. Battisti referred Hinely to Dr. Blackwell for evaluation on October 13, 1997. R. 569-570. Dr. Blackwell recorded Hinely's complaints as long-standing pain in the low back, numbness in the left foot at times, pain in the right elbow, worsening pain of the right knee, history of ADHD, ligamentous injury to both right and left knees, rotator cuff trauma of the left shoulder, and TMJ problems corrected surgically.

On October 21, 1997, Hinely saw orthopedist William Carson, M.D. for his complaints of knee and elbow pain. X-ray showed joint space narrowing of both knees with weight bearing, and lateral epicondylitis of the right elbow.

Hinely provided records from Dr. Carson for treatment received between October 1997 and July 9, 1998. Dr. Carson's letter report dated October 21, 1997 revealed he was seeing Hinely for multiple complaints (low back pain, bilateral knee pain and right elbow pain) secondary to an October 7, 1997 slip in which Hinely struck his right elbow. Dr. Carson's impression was: "lateral

epicondylitis[3] of the right elbow and early joint space narrowing of both knees." Dr. Carson prescribed Naprosyn and follow up as needed.

Lumbar spine X-rays in November 1997, showed middle hypertrophic spurring involving the anterior aspect of L3-4 and L4-5 vertebral bodies. R. 614. MRI November 8, 1997 showed diffuse loss of disc hydration extending from L1-2 to L5-S1 with mild loss of disc height, an annular[4] tear at the L4-5 and L5-S1 levels, and mild indentation of the thecal sac from the bulging disc extensively from L2-3 to L5-S1. R. 615, 625.

A second MRI four days later showed multi-level bulging disc with dehydration, radial tear at L23-3, L4-5, and L5-S1, and small posteriocentral protrusion of the disc at the level of L5-S1, with obliteration of the anterior epidural fat with "what appears to be a small cyst in the left side of the body of the L2 vertebra." R. 616-617.

The next day, Hinely presented to the ER with complaints of severe back pain. 640-641. He returned to Dr. Blackwell on November 19, 1997, complaining that his back was getting worse. R. 566-567.

Incident to his second hearing, Hinley submitted first responder notes reflecting he was transported by ambulance on December 3, 1997 in response to a fall while in the standing position resulting in radiating back pain. R. 1060.

Hinely was admitted to the hospital on December 18, 1997, for acute intractable back pain. R. 618-619. He reported having fallen again. The examining doctor reported that Plaintiff was

_____

[3]Inflamation of the epicondyle or of the tissues adjoining the epicondyle of the humerus. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

[4]Shaped like a ring. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

severely histrionic and uncooperative with range of motion testing due to reported pain. R. 622. Straight leg raising was positive at only five to ten degrees. Sensation to light touch and pinprick was intact, equal and symmetrical. The doctor noted questionable malingering. Plaintiff was admitted and treated with Demerol overnight. He was evaluated by physical therapy and was found to have pain out of proportion to his physical examination. R. 619. He was able to sit, stand and walk a few steps with much histrionic, but with no difficulty moving. He was discharged with a diagnosis of acute low back secondary to re-injury with histrionic overlay and chronic back pain history. The admitting physician noted:

> Patient showed a lot of histrionics during the exam with multiple complaints of back and leg pain during his lower extremity exam . . .

It was felt Hinely's pain was out of proportion to the physical findings.

Incident to his second hearing, Hinely submitted first responder notes reflecting he was transported by ambulance on January 13, 1998 in response to a fall on concrete steps. R. 1059.

By referral from Dr. Blackwell, Hinely was evaluated by Dr. Tamea on January 21, 1998. R. 536, 562-563. Dr. Tamea opined that Hinely suffered "significant back disability" and recommended physical therapy and nonsteroidal medications. He did not feel that Hinely was a candidate for surgery.

Dr. Blackwell's office notes of February 2, 1998, indicate Hinely reported having fallen after his appointment with Dr. Tamea, and that he had experienced several episodes of numbness and anesthesia to the lower extremities, predominantly the left, followed by parasthesia. R. 561. Dr. Blackwell noted discoloration of the left toes and lower extremity. On February 16, 1998, Hinely again reported falling episodes. Dr. Blackwell again noted areas of inflammation on Plaintiff's forehead indicative of trauma. R. 560.

EMG and Nerve Conduction Studies of the lower extremities were "consistent with acute L5-S1 radiculopathy, most likely due to ruptured disc." R. 557-558. A neurosurgical consult was recommended. Hinely was seen for a consultative examination by Dr. C. Y. Amores. R. 533-535. Dr. Amores noted that the examination was difficult because Hinely reported every move hurt his back. R. 535. An MRI revealed a diffuse bulge and annular tear at L4-5 and L5-S1. Dr. Amores concluded that Hinely had "significant, chronic low back pain that goes down both legs without any neurological deficit." He recommended conservative treatment.

On May 19, 1998, Hinely reported having injured his right wrist in a fall. R. 541. X-rays showed possible ulnar styloid fracture and definite injury to the triangular fibrocartilage complex. His wrist was casted. A week later, Hinely again reported falling due to numbness in his legs. R. 551-552. He had broken his wrist cast in this fall.

Dr. Carson's report dated May 19, 1998 and submitted incident to the second hearing revealed treatment using a well-padded, short arm, fiberglass cast with follow up in four weeks for a recent fall onto an outstretched right hand resulting in a possible ulnar styloid fracture." R. 1077-1082. Contemporaneous x-rays of the right arm revealed "no evidence of recent fracture" but the radiologist suspected a strain or sprain. R. 1083-1084.

A second neurological evaluation in June 1998, showed normal 5/5 strength throughout. R. 531. Hinely reported diffuse bilateral lower extremity parasthesia. An EMG was consistent with a bilateral L5-S1 radiculopathy. An MRI had shown a small central disc bulge at L4-5 without any nerve root impingement. The clinical impression was low back pain without any evidence of radiculopathy. R. 532.

Hinely continued to complain of low back pain, lower leg pain, numbness and give away

weakness of the legs through June 1998. R. 546-551. He reported another fall with injury to his left shoulder on June 29, 1998. R. 545.

Hinely saw Dr. Blackwell regularly for his back pain through July 1998. He continued to complain about his legs going out on him and falling. He also presented to the ER in March and May of 1998, with complaints of severe, chronic back pain. Beginning May 5, 1998, Dr. Blackwell's diagnoses also included anxiety and depression , hearing loss, R/O hypertension, and dyspepsia. Hinely was referred to Dr. Amar for his dyspepsia. R. 594. Dr. Amar interpreted Hinely's EGD as showing Barrett's disease, moderately severe gastritis, a small hiatal hernia, mild duodenitis and hypertrophied Brunner's glands. R. 594. These diagnoses were confirmed by pathology. R. 580-581, 595-596.

On July 13, 1998, Hinely reported increasing anxiety and headaches R. 543-544.

Hinely was referred to Dr. Deer at the Center for Pain Relief in August 1998. Dr. Deer subsequently referred him to Dr. Silk and Dr. Gutmann, a neurosurgeon, for evaluation. R. 578. That same month, Hinely began seeing Dr. Milan as his family doctor. R. 541-542. Hinely continued to report falls due to giveaway weakness in his legs. He also began complaining of loss of bowel and bladder control.

According to records submitted incident to the second hearing, Dr. Silk examined Hinely and diagnosed lumbar spondylosis. He recommended a myelogram.

Hinely supplied records from Dr. Edith Milan covering the period between November 19, 1998 and December 3, 1998 and of Dr. Adnan Silk for September 17, 1998. The substance of the records was that both doctors saw and evaluated Hinely for his complaints of pain, numbness and loss of control of his lower limbs. Dr. Silk's objective findings included: no tilt in the spine; no

motor weakness in Hinely's lower extremities; good flexion and extension of both legs; the dorsiflexion and plantar flexion are strong and symmetrical; the knee reflexes are active 2+ bilaterally and the ankle reflexes are active on the right and absent on the left; decreased sensation to pinprick in the posterior aspect of both legs; no Babinski's[5] sign; able to walk without any difficulty. Dr. Silk recommended Hinely be worked up for possible multiple sclerosis. R. 1089-1090.

Hinely presented to the ER on October 13, 1998, after reporting he had fallen due to his legs "giving way." R. 599, 610-613. X-ray of the lumbar spine showed lumbar spondylosis, unchanged from 11/8/97. R. 645. A CT scan showed Schmorl's node and/or degenerative changes of the superior end plate of the body of L2. R. 644.

Hinely presented to the ER again on November 7, 1998, for complaints of acute exacerbation of back pain. X-rays indicated a mild degree of degenerative changes of L2-3 and L3-4 with small anterior osteophytes. R. 217, 600-603.

First Responder notes submitted incident to the second hearing reflect Hinely was seen by ambulance personnel but refused transport on November 18, 1998 in response to his call and reported inability to move following his driving back home from a friends house. R. 1058.

Dr. Gutmann saw Hinely on December 1, 1998. Upon examination, strength muscle tone, and coordination were normal. R. 654. Plaintiff walked with a slow, antalgic gait. Upon examination, Dr. Gutmann noted an absent left ankle jerk. She also noted that the sensory exam was difficult to interpret, with some questionable decrease in vibratory sensation to the knees bilaterally

---

[5]Loss or lessening of the Achilles tendon reflex in sciatica. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

and unreliable proprioception testing. She noted Hinely had decreased pinprick sensation below the knees bilaterally. R. 654, 661, 665. He had a positive Lhermitte's Sign.[6] She recommended an MRI of the cervical spine, but noted this would not explain the severe low back pain.

Charles Paroda, D.O. examined Hinely for the State agency on December 2, 1998. R. 670-678. He noted Plaintiff showed joint discomfort with range of motion that appeared to be out of proportion to the physical findings. R. 675. He also noted that Hinely acted like he was going to fall several times, but would catch himself and not fall. Instead he "kind of stumbled." R. 675. There was no evidence of any muscle atrophy or wasting. Muscle tone was excellent throughout. He also had excellent strength bilaterally and complaints of severe pain in his legs and back were out of proportion to the physical findings. R. 675. Hinely walked with a cane, but Dr. Paroda could not detect a gait defect. Hinely was able to stand on one leg and walk heel-to-toe, but complained of pain and weakness in his legs. Deep tendon reflexes were normal. Dr. Paroda summarized the examination as follows:

> Overall, except for his complaints of muscle aches and pain and the myalgia/arthralgias, the remainder of the exam was within normal limits. I'm not exactly sure what type of problems this patient truly has physically. He does complain of having some attention deficit hyperactivity disorder and he has an evaluation scheduled for that. Some of his physical problems may have an underlying psychological base. R. 676.

Hinely underwent a psychological battery of tests with Dr. Battisti on December 4-7 1998. R. 219-227. Dr. Battisti noted Hinely's anxiety level was somewhat higher than appropriate. His mood was dysphoric. There were some difficulties in immediate memory, attention and

---

[6]The development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward; seen mainly in multiple sclerosis but also in compression and other disorders of the cervical cord. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 1700 (30th ed. 2003).

concentration.  Some motor problems were exhibited.  Axis I diagnoses were pain disorder, mood disorder due to major depressive-like episode, anxiety disorder, R/O undifferentiated somatoform disorder, and R/O ADHD.  Axis II diagnoses included personality disorder, NOS and R/O schizoid personality disorder.  Dr. Battisti completed a Mental RFC (R. 689-692), finding Hinely moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal work day and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to set realistic goals or make plans independently of others.

Dr. Battisti also completed a Psychiatric Review Technique ("PRT") form, opining Hinely met the "A" criteria of Listings 12.02, 12.04, 12.06, and 12.08 (R. 693-701).  He found moderate limitations in activities of daily living, social functioning and concentration, persistence or pace, and opined Hinely would once or twice experience episodes of deterioration and decompensation in a work-like setting.

In January 1999, Hinely underwent a cervical MRI which showed diffuse bulging at the C3-4 level with effacement of the subarachnoid space.  R. 650-651.  Dr. Gutmann did not believe this could account for Hinely's symptoms of back pain, neck pain and multiple symptoms.  She also ruled out multiple sclerosis.  Based upon the MRI with no evidence of multiple sclerosis, Dr. Gutmann referred Hinely back to Dr. Deer for pain management.  R. 647-648.

First Responder notes reflect Hinely was transported by ambulance on February 16, 1999 in response to Hinely reporting  a fall and hitting of his head on an end table.  R. 1057.

First Responder notes submitted incident to the second hearing reflect Hinely was transported by ambulance on February 22, 1999 in response to a fall he reported while walking to a truck. R. 1055-1056.

In February 1999, Hinely again underwent an MRI of the lumbar spine. R. 213. It showed minimal degenerative disc disease at multiple levels with loss of disc hydration and small posterior annular tear at the L4-5 level.

Hinely saw his family physician Dr. Milan six times in January and February 1999, and presented to the ER at least three times between January and July 1999, for falls with accompanying injury. R. 207-210, 203-205, 199-201.

On July 15, 1999, Cardinal Psychological Services, where Dr. Battisti practiced, indicated that Hinely was seen there fairy regularly between October 6, 1997, and March 17, 1999. R. 218. The office refused to submit the handwritten reports of Hinely's office visits as per its policy, but did state that as of his last visit, Hinely continued to exhibit depression, anxiety and pain related symptoms.

Hinley underwent a psychological evaluation on July 27, 1999 for depressive and anxious symptoms related to chronic pain. According to reports submitted incident to the second hearing, objective testing revealed full scale IQ at 103 or average range of intelligence; the disparity between of Verbal IQ of 96 and his Performance IQ of 111 is indicative of Hinley's nonverbal cognitive abilities being better developed than his verbal skills; Hinely's WRAT-3 tests scores placed him in the average range for a high school graduate; Hinely's Bender Visual Motor Gestalt Test were essentially normal; the MMPI-II test was not valid but the examiner noted that it would not be unusual for a person suffering with chronic pain to have extremely elevated F-scale results.

Vocational rehabilitation to explore training for job skills which could provide a means of gainful employment was recommended. R. 1091-1095.

Hinely's treating psychiatrist, Dr. Iyer, produced a Mental RFC dated August 13, 1999, finding Hinely moderately limited in his ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal work day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently of others. R. 240-243. Dr. Iyer also completed a Medical Assessment of Ability to do Work-Related Activities assessment form indicating Hinely's ability to deal with work stresses would be poor. R. 244-255.

In October 1999, Hinely began seeing Dr. Antoine Katiny, M.D. R. 250-251. Dr. Katiny referred Plaintiff to neurologist J. Weinstein, M.D. for evaluation. R. 249. Examination revealed negative straight leg raising and no obvious weakness in the extremities. Dr. Weinstein could not account for Hinely's symptoms and indicated that the MRI showed only minimal disc disease. He advised Hinely to strengthen his back with exercise. An x-ray of Hinely's knee was normal.

In December 1999, Hinely was again referred to Dr. Carson for complaints of right knee pain. R. 260. X-rays showed mild early stress and degenerative changes. Dr. Carson opined that Hinely should continue to use a cane in his left hand.

A December 23, 1999 consultative examination by A. Sabio, M.D., revealed normal fine manipulative movements, normal sensory and motor function, and normal deep tendon reflexes.

R. 257. Hinely's knees had reported tenderness, but full range of motion and no effusion[7]. There was no ligamentous laxity. R. 255. There was no redness, heat or swelling. The shoulders, elbows, wrists and hands had no tenderness, redness or swelling. Dr. Sabio diagnosed degenerative arthritis of the lumbar spine and degenerative disc disease.

In January 2000, Dr. Katiny opined that Hinely could work only part time at the sedentary level. R. 264. Dr. Katiny was considering fibromyalgia as a diagnosis, and referred Hinely to Dr. Pfister at Charleston Area Medical Center ("CAMC"). Dr. Pfister noted decreased left ankle jerk, not sustained clonus right side ankle, and tenderness over both quads, the S1 area, both trapezius and lower scapulars, and epicondyle. He also noted left rotator cuff impingement to mild degree. An MRI of the lumbar spine showed disc bulge with associated osteophytic spurs at L2-3 and L3-4. Dr. Pfister opined that Hinely was "fibromyalgic," plus had an element of degenerative disc on the left side. R. 314-315.

EMG and nerve conduction studies on February 24, 2000, indicated bilateral carpal tunnel syndrome of the upper extremities and moderate to severe peripheral neuropathy, sensory and motor of the lower extremities. R. 317. The carpal tunnel syndrome was treated conservatively with bilateral wrist braces, without success. In May 2000, Hinely underwent surgical release of the left wrist. R. 336-338.

Incident to the second hearing Hinely submitted records from the 2000 time frame including March, April and May 2000 reflecting evaluation and treatment for complaints of pain, numbness, and tingling in his hands, conservative treatment with splinting and finally surgery for carpal tunnel

---

[7]The escape of fluid into a part or tissue, as an exudation or a transudation. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

syndrome. The surgery was performed with the initial effect of eliminating the pain, numbness and tingling in his hand and thumb. R. 1097-1098.

Dr. Iyer completed a second RFC in April 2000 which is essentially the same as the previous noted RFC.

On May 19, 2000, Dr. Cameron completed a second psychological assessment, diagnosing major depressive disorder and generalized anxiety disorder.

**Post June 1, 2000 (Disability Date) Medical History**

Throughout 2000, Hinely continued to treat with Dr. Katiny, to whom he continued to report back pain, left shoulder pain, bilateral wrist pain, neck pain, and radiculopathy and numbness of both legs, among others. A November 2000 MRI showed herniation at the C3-4 level. R. 350.

According to records submitted incident to the second hearing, on January 11, 2001 Dr. Jon S. LaPlante read x-rays of Hinely's left clavicle to show no acute fracture; no destructive lesion involving the clavicle; an intact AC joint; a surgical pin overlying the glenoid and otherwise unremarkable findings. R. 1054.

According to records submitted incident to the second hearing, on April 21, 2001 Hinely was seen at Webster County Memorial Hospital for complaints of pain and injury to his left hand due to a fall four days prior and exacerbation of that pain and injury due to a fall on the night of presentation. He was given an ice pack, x-rayed, given pain medication and discharged in a stable condition. X-ray of the left hand was negative. R. 1053.

According to records submitted incident to the second hearing, on August 26, 2001 Hinely was seen at the Webster County Memorial Hospital for complaints of left jaw pain. He was given medication and discharged in stable condition. R. 1051-1052.

According to records submitted incident to the second hearing, on October 25, 2001, Hinely was examined by Dr. Shah incident to the beginning of a series of lumbar epidural steroid injections. Dr. Shah noted the following subjective findings: "tenderness in the lumbar spine, worse in the bilateral paraspinous regions....significant tenderness also at the sacroiliac joints bilaterally....Midline also tender from the distal thoracic region distally with coccygeal involvement, worse in the midline at the mid sacral body itself....The sciatic notches are tender bilaterally with trochanteric region nontender." With respect to objective test results, Dr. Shah found and reported: "Lasegue's and Waddell's are negative" and "Negative edema in the lower extremities." R. 1075.

According to records submitted incident to the second hearing, a November 12, 2001 MRI of Hinely's cervical spine read by Dr. Johnsey L. Leef noted: "There is a mild ventral spondylosis at the C3-C4 level. On the axial images there is an eccentric disk herniation C6-C7 on the right." R. 1024.

According to records submitted incident to the second hearing, on November 26, 2001, Hinely was seen by Dr. Shah incident to the second of a series of lumbar epidural steroid injections. Hinely reported getting significant relief from the first injection. A second lumbar epidural steroid injection was administered. R. 1071-1072.

Records submitted incident to the second hearing reflect that on December 28, 2001 Hinely was seen by Dr. Shah for the third in a series of lumbar epidural steroid injections. He reported "pain in his low back is stabbing and throbbing in quality, 8 at its worst over the last 30 days, 5 with medications. The pain does continue to be constant, worse in the evening and at night. A hot bath and heat alleviates his pain. Increased activity exacerbates it. He continues to have numbness in his legs, left worse than right. Some tingling as well. He denies any burning. He has some swelling

22

in has back and hands at times. He sleeps about 2 hours a night but he does nap some during the day....He states the first in the series of injections provided him with 4 weeks relief, the second one provided him with about 2 weeks relief." A third injection was administered. R. 1069-1070.

Hinely was again seen by Dr. Shah on May 10, 2002 incident to a series of lumbar epidural steroid injections for his low back complaints which included a bulging disk at L4/5 and L5/S1 with facet arthropathy and sacroilitis; L5/S1 radiculopathy; herniated nucleus pulposus at C6/7 on the right; spondylosis at C3/4 and T8/9 disk protrusion to the right and a T12/L1 left sided disk protrusion. On examination, the clinic noted that Hinely subjectively reported "quite a significant amount of tenderness in the cervical spine and the paracervical musculature, more on the right than the left with suprascapular tenderness on the medial borders of the scapula. Continues to be tenderness over the lumbosacral spine beginning at L2 and continuing to the sacrum distally, this does extend over the SI joints bilaterally. There is some nonspecific paravertebral muscular pain over the left paravertebral musculature." Objectively the clinic noted: "some SI joint tenderness as well and swelling at the PSIS on the left. There is no spasm today. There is no particular increase in tone." However, the clinic opined the "continued symptoms consistent with the radiculopathy of the left lower extremity in the posterior portion of thigh and down into the left foot posterolaterally." The clinic noted Hinely was "able to ambulate adequately on both feet" with the use of a cane and "rises and sits appropriately" and that his "gait is antalgic favoring the left side." No injections were performed pending diagnostic testing. R. 1067-1068.

On June 7, 2002, Dr. Shah, a Board Certified Pain Manager and a Diplomat of the American Board of Anesthesiology, diagnosed Hinely with "Bulging disc at L4-5 and L5-S1 with facet joint arthropathy and sacroilitis, L5-S1 radiculopathy on EMG; herniated nucleus pulposus at C6-7 on

the right; Spondylosis at C3-4; T8-9 disc protrusion to the right; T12-L1 left sided disc protrusion and overlying myofascial pain syndrome over the cervical, thoracic, and lumbar spines." R. 1064-1066.

On March 28, 2003 Hinely was seen at the Webster County Memorial Hospital for complaints of rib cage pain occurring post stumbling and falling and after coughing episode in which Hinely heard a pop and felt his rib cage pulling. He was noted to have sinus drainage and a cough. He was discharged home in a stable condition. R. 1048-1050.

Records submitted incident to the second hearing reflect that on October 1, 2003 Hinely was seen at the Webster County Memorial Hospital for consultation with respect to his complaints of chronic back pain with some radiation into his legs and possible left inguinal hernia. He was continued on a regimen of pain medication for his complex regional pain syndrome and was prescribed other medications for mood because he was unable to tolerate Zoloft. R. 1046.

Records submitted incident to the second hearing reflect that on October 17, 2003 doctors at the Webster County Memorial Hospital diagnosed and treated Hinely for his complaints of rib pain and left knee pain noting that his complex regional pain syndrome involving his back was under control with the current medication regimen. R. 1044-1045.

Records submitted incident to the second hearing reflect that on November 21, 2003 Hinely was seen at the Webster County Memorial Hospital for complaints of recent mood swings secondary to financial stress, chronic pain problems and testicular stress. Referred to urology. R. 1042-1043.

Records submitted incident to the second hearing reflect that Hinely was seen at the Webster County Memorial Hospital on December 27, 2003 for complaints of pain in the left ankle and left knee. He complained of slipping a couple of times but not of falling. R. 1038-1041.

Records submitted incident to the second hearing reflect that on March 19, 2004 Hinely was seen at Webster County Memorial Hospital for outpatient observation and ultimate discharge for complaints of non-radiating substernal pain and chronic pain syndrome. R. 1037.

Records submitted incident to the second hearing reflect that on May 17, 2004 Hinely was seen at the Webster County Memorial Hospital for complaint of injury to his right leg and foot and a cut middle finger from a fall on the same day. The finger wound was cleaned and dressed. R. 1035-1036.

Records submitted incident to the second hearing reflect that on June 12, 2004 Hinely had an MRI of his lumbar spine which showed: "Mild dextroscoliosis. Lumbar vertebral bodies appear otherwise normal in height and alignment. Moderate diffuse posterior disk bulge at L2-3 with disk material extending into the inferior aspects of neural foramina but not grossly compressing the nerve roots. Moderate diffuse posterior disk bulge L4-5 with disk material apparently contacting but not grossly compressing the exiting nerve roots bilaterally. Moderate diffuse posterior disk bulge L5-S1 with disk material apparently contacting but not grossly compressing the nerve roots bilaterally. No significant spinal stenosis in the lumbar region." R. 1034.

Records submitted incident to the second hearing reflect that Dr. Miller read multiple x-rays of Hinely's cervical spine on July 21, 2004 to show: "no prevertebral soft tissue swelling; ... no loss of vertebral body height; ... vertebral bodies are intact; ... appears to be coalition of the posterior elements at C5-6; ... anterior view demonstrates spina bifida occulta at C6; ... no evidence of fracture or dislocation." R. 1033.

Records submitted incident to the second hearing reflect that on October 1, 2004 Hinely had a MRI with and without contrast of his brain to evaluated his complaints of cervical pain and

bilateral arm numbness. Dr. James A. Ross read the MRI to show: "Ventricles and extra-axial spaces appear normal. There is no mass lesion or mass-effect and there is no abnormal enhancement on contrast administration. There is no abnormal signal within the brain. Diffusion weighted images were obtained show no evidence of infarction. Midline structures of the brain appear normal. Incidental note is made of fluid signal in the right mastoid air cells and right maxillary sinus. Sinus disease and mastoiditis is questioned." R. 1022. Dr. John A. Leaon read the MRI of the cervical spine to show: "a focal posterior disc protrusion at the C3-C4 level to the left of the midline. This is noted impressing upon the anterior aspect of the thecal sac. The appearance is consistent with focal disc herniation. A second focal disc protrusion is seen at the C6-C7 level on the right side. This is noted significantly impressing the anterior aspect of the thecal sac and also contacting the anterior aspect of the cervical cord at this level. This is in the vicinity of the exiting nerve root at the C6-C7 level and some impression upon the exiting root is also suspected. The remaining intervertebral discs appear normal. Some mild anterior osteophyte formation is seen at the C6-C7 level." R. 1023.

Records submitted incident to the second hearing reflect that on May 11, 2005 Hinely was seen at the Webster County Memorial Hospital for a check of his great toe and knee. Hinely came in complaining of back pain and neck pain secondary to a fall on the Friday before May 8, 2005. Hinely was also seen at the hospital on May 8th for the fall. At that time he was complaining of pain in his right knee. He was released stable and improved. R. 1029-1031.

Records submitted incident to the second hearing reflect that on June 9, 2005 Hinely was seen at the Webster County Memorial Hospital for complaints of pain shooting from lower back to ribs and sometimes causing numbness in the lower extremities and neck pain. R. 1027.

Records submitted incident to the second hearing reflect that on August 4, 2005, Hinely underwent a cervical spine MRI. Dr. Jeffery Hogg read the MRI and reported: "a congenitally somewhat diminutive central spinal canal;" "somewhat diminutive subarachnoid spaces beginning at the upper C3 through upper C7 vertebral body levels;" "some straightening of the expected cervical lordosis;" "cervical spinal cord is surrounded by a paucity of cerebrospinal fluid, particularly at the C6-C7 level and at the C3-C4 level;" cord has a somewhat distorted contour at these levels;""there are several tiny foci of hyperintense signal within the cord suggesting the possibility of some chronic compressive myelomalacic change;" at the C3-C4 level "there is localized displacement of disk material in the left central zone and this has the appearance of a disk herniation of protrusion configuration .... associated with vertebral body end plate osteophytes.... mild narrowing of the left C3-C4 neural foramen;" "At the C4-C5 level, there is some generalized displacement of disk material with associated endplate osteophyte formation resulting in bilateral neural foraminal and central canal narrowing;" "At the C6-C7 level, there is localized displacement of disk material in a right central and right foraminal zone and this is associated with vertebral endplate osteophytes. This results in narrowing of the right neural foramen and some lateralized effacement of the central spinal canal, particularly on the right;" resulting in Dr. Hogg opining: "Acquired degenerative cervical spondylosis as outline above by level superimposed on a congenitally diminutive spinal canal. The cercival spinal cord contour is distorted by adjacent osteophytes and several small foci of hyperintensity may represent some chronic myelomalacic change in the cord." R. 1061-1063.

During the second administrative hearing held February 9, 2006 most of the first 4 pages of the transcript are devoted to preliminary matters, Hinely's counsel's statement of reasons for leaving

the record open to supplementation and her objections to the ALJ's decision to not call for an independent medical expert. R. 1186-1190.

Hinely testified that he wanted to make sure that his low back problems of the 1980's was in the record because he was out of work for close to 11 months. R. 1191. It was within that testimony that Hinely stated he had four separate worker's compensation claims in South Carolina. He explained he had two left shoulder injury surgeries, two right knee surgeries, and one left knee surgery all prior to 1997. R. 1193. He explained that the fall he had at work giving rise to injury and a compensation claim was the result of his having driven a fork lift off a pier and was not the same type of fall that he claims he later experienced. He described the later falls as being caused by his lower back and legs feeling like "they're asleep continuously. ... a tingling sensation down my legs and I cannot move four toes on my left foot. And sometimes I move a certain way and I lose feeling in my - - from my waist down and I fall." R. 1194. In describing when he was having the falls, the best time frame Hinely provided was: "Well, from the - - I cannot remember when the doctor gave me a cane but I had fallen numerous times before that and I had fallen numerous times with the cane. And it was all within the last - - quite some - - quite a few years." R. 1195.

Larry Bell, a vocational expert, testified at the second hearing. In response to the ALJ's first hypothetical which included: limiting the individual to light work with a sit / stand option; occasional postural movements except no climbing of ladders, ropes or scaffolds; a low stress environment with no production line type of pace or decision making responsibilities; with no temperature extremes; limited or unskilled work involving only routine and repetitive instructions and tasks; and no more than occasional interaction with others, Bell testified there were 150,000 national and 1,950 regional jobs as an office assistant; or 202,000 national and 1,050 regional non-

postal mail clerk jobs available. Even reducing the individual to sedentary, Bell testified there were 141,000 national and 1,400 regional jobs as a machine tender and 299,000 national and 2,900 regional jobs as a general office clerk available. R. 1196-1197. On cross-examination, Bell testified that adding a complete option to sit or stand as needed may reduce the sedentary jobs by 25%. R. 1198. Bell also testified on cross examination that eliminating occasional squatting, kneeling or crawling would rule out the mail clerk job. R. 1198. Bell also testified on cross-examination that elimination of prolonged or repetitive movements with the left arm and shoulder would affect the light jobs that required some standing but not the sedentary jobs. R. 1199. In response to Hinely's counsel's assertion that the individual had an uncorrected left hand carpal tunnel syndrome and was required to use the left hand to hold a cane when working and should not therefore stress that hand, Bell testified it would not affect positions he had previously mentioned because those jobs don't require much gross grasping. R. 1199-1200. When counsel added the restriction that the individual would not be able to use his left shoulder and right arm in prolonged repetitive motions because of acute tendonitis, Bell testified all sedentary jobs would be ruled out. R. 1202. When counsel added that the hypothetical individual fell a couple of times per month on average without warning, Bell testified that would negatively impact employment because supervisors and employers would not want someone working for them that was in danger of falling and getting hurt. R. 1203. When counsel added chronic pain to the hypothetical, Bell testified, if the chronic pain caused the individual to be unable to concentrate up to half of the time, then the individual would not be able to complete the job satisfactorily. R. 1205. Finally, when counsel added that carpal tunnel syndrome of the hands would make the individual incapable of less than occasional fine manipulation, Bell testified that would impact employment at the jobs he had listed because they

require more than occasional fine manipulation. R. 1205.

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 1998.
2.  The claimant has not engaged in substantial gainful activity at any time relevant to the decision.
3.  During the period under adjudication the claimant had the following combination of severe impairments: back pathology; history of knee injuries and arthroscopic surgeries; peripheral neuropathy of the lower extremities; bilateral carpal tunnel syndrome; attention deficit disorder, anxiety disorder; and somatoform disorder (Regulations (20 CFR §§ 404.1520(c) and 416.920)).
4.  During the period under adjudication, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, the undersigned finds that during the period under adjudication the claimant has the following residual functional capacity: he is able to perform a range of sedentary work; requires a sit / stand option; can perform postural movements occasionally, except cannot climb ladders, ropes or scaffolds; requires a cane for ambulation; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more than occasional interaction with others.
6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7.  The claimant was born on December 21, 1958, and was 41 years old on June 1, 2000, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).
8.  The claimant has a high school equivalent education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9.  Transferability of job skills is not material to the determination of disability due to the claimant's age during the period of adjudication (20 CFR 404.1568 and 416.969).
10. Considering the claimant's age, education, work experience, and residual functional capacity during the period under adjudication, there are jobs that exist in significant numbers in the national economy that the claimant would have performed (20 CFR 404.1560©, 404.1566, 416.960©, and 416.966).
11. The claimant has not been under a "disability," as defined in the Social Security Act, from January 1, 1997, through May 31, 3000 (20 CFR 404.1520(g) and 416.920(g)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (*quoting* Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (*quoting* Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ's evaluation of the listings was inadequate.

      A.    ALJ's discussion of the listings did not satisfy Cook v. Heckler, 783 F.2d

1168 (4th Cir. 1986).

B.     ALJ use the wrong form of musculoskeletal listing for the period under consideration.

C.     ALJ did not consider combination of impairments at Step 3.

2      The ALJ abused his discretion in failing to call a medical expert to testify at the hearing.

3.     The ALJ should have called a medical expert to assist in inferring the onset date. SSR 83-20.

4.     The ALJ decided the case on the basis of an incomplete hypothetical question.

The Commissioner contends:

1.     The ALJ correctly concluded that Plaintiff's impairments did not meet or equal the criteria of any listed impairment.

2.     The ALJ was not required to obtain medical expert testimony.

3.     The ALJ's hypothetical question accommodated all of the functional limitations supported by the record.

## C.  Analysis of Contentions

**1.     Listings**

**a.     Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986)**

Hinely first argues the ALJ failed to satisfy the requirements of Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986) by making statements in the decision that "are merely conclusory and do not make reference to the evidence of record." DE 14, p. 9 of 15.

In the 2007 Hinely decision, the ALJ wrote:

Likewise, as affirmed by the magistrate judge, the objective medical evidence of record during the period under adjudication regarding the claimant's back pathology does not show significant compromise of any nerve root or the spinal cord in the spine, appropriate evidence of nerve root compression, or pseudoclaudication resulting in an inability to ambulate effectively sufficient to meet or medically equal listing 1.04 during the period under adjudication. Furthermore, the objective medical evidence of record regarding the claimant's knee impairment failed to show persistent knee joint pain and stiffness with signs of marked limitation of motion or abnormal motion on physical examination, with no x-ray evidence of significant joint space narrowing or significant bony destruction sufficient to meet or medically equal the criteria of Listings 1.02 or 1.03. Additionally, the claimant's lower extremity neuropathy has not resulted in disorganization of motor functions necessary to meet or medically equal Listing. Finally, objective medical evidence of record failed to show sufficient persistent disorganization of motor functions from his bilateral carpal tunnel syndrome to meet any listing found in section 11.00 for neurological disorders. R. 845.

In Cook, the Court held: "... the Secretary failed to comply with those procedures[8] in two important respects, with the result that we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not." Cook v. Heckler, supra at 1172. The Court found the Commissioner's explanation of his decision that the widow Cook's severe impairments did not meet or equal one of the listings was deficient for several reasons: 1) "First it suggests that the examination was limited to one hip and one shoulder, whereas in fact all of her major joints were examined"; 2) "the decision failed to identify the standard to be applied", 3) [t]he ALJ did not explain which of those listed impairments were considered to be relevant"; 4) "[h]e also failed to compare Cook's symptoms to the requirements of any of the four listed impairments, except in a very summary way; and 5) "he said that 'there is [sic] no ... other mandated criteria' which presumably means that he thought that Cook presented none of the symptoms described under any

---

[8]The Cook Court first found that "[a]dministrative determinations are required to be made in accordance with certain procedures which facilitate judicial review. Cook v. Heckler, supra at 1172.

of the four impairments listed within section 101." <u>Cook v. Heckler</u>, *supra* at 1173.

The only failure of the five (5) outlined in <u>Cook</u> that Hinely complains about is the alleged failure of the ALJ to compare Hinely's symptoms to the requirements of the listed impairments, to wit: back pathology, knee, lower extremity neuropathy, and carpal tunnel syndrome. The <u>Cook</u> Court outlined that by comparison of "symptoms to the requirements of the listed impairments" it meant: "The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms." Absent such a comparison, the Court explained "it is simply impossible to tell whether there was substantial evidence to support the determination." *Id.*

The Commissioner argues Hinely has the burden of proving that his impairments satisfy the medical criteria of each listing claimed. He cites <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) for the proposition that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." The Commissioner has taken this quote out of context. It is a correct quote for the then existing Social Security Ruling (SSR) 83-19. However, it is not the ruling in <u>Sullivan</u>. Instead, the <u>Sullivan</u> Court held that the Commissioner's (Secretary) regulations and rulings requiring that a child could only qualify for SSI if he met a listing "did not carry out the statutory requirement that SSI benefits shall be provided to children with 'any ... impairment of comparable severity' to an impairment that would make an adult 'unable to engage in any substantial gainful activity.'" *Id.* at 541. Therefore, the ruling in <u>Sullivan</u> has no value to resolution of the specific issue raised by Hinely.

The undersigned has never construed <u>Cook</u> to require the Commissioner to marshal the evidence and recite the marshaled evidence for each listing criterion. It should also be noted that

34

Cook does not mandate a specific procedure. Cook merely stands for the proposition that because the ALJ did not make the comparisons, the appellate court was not in a position to determine that the ALJ's determination in that case had to be upheld because it was supported by substantial evidence.

Cook v. Heckler at p. 1172 notes that 42 USC 405(b) and 5 USC 557© requires the ALJ to "include in the text of her decision a statement of the reasons for that decision." Contrary to Hinely's assertions, the undersigned finds the ALJ did identify the relevant listed impairments and did then compare listed criteria to whether the record contained evidence that supported a finding that the criteria had been met.

To the extent Hinely challenges the evidentiary basis in the record for the ALJ's stated reasoning with respect to Listing 1.04 for the period under consideration, the following excerpts from the voluminous record is an example of the substantial evidence that was available to be considered and now supports the decision of the ALJ:

A.	With respect to nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine), surgery was never recommended R. 562-563; treating physicians in late 1997 opined that Hinely was severely histrionic, exhibited questionable malingering and claimed pain out of proportion to his physical examination R. 619-622; MRI's and lumbar spine x-rays taken in November 1997 do not note any nerve root compression R. 615, 625, 616-617; in early 1998 consulting physician Dr. Amores found Hinely had "significant, chronic low back pain that goes down both legs *without any neurological deficit.*" and recommended conservative treatment (emphasis added) R. 533-535; a June 1998 MRI showed a small central disc bulge at L4-5 *without any nerve root impingement* with a clinical impression of low back pain *without any evidence of radiculopathy* (emphasis added) R. 532; Dr. Silk examined Hinely in the Fall of 1998 and noted no tilt in the spine, *no motor weakness* in Hinely's lower extremities, good flexion and extension of both legs, the dorsiflexion and plantar flexion are strong and symmetrical, the knee refexes are active 2+ bilaterally and the ankle reflexes are active on the right and absent on the left, decreased sensation to pinprick in the posterior aspect of both legs, no Babinski's sign, able to walk without any difficulty R. 1089-1090; Dr. Gutmann

examined Hinely on December 1, 1998 finding his strength, muscle tone and coordination were normal, he walked with a slow antalgic gait, was absent a left ankle jerk, sensory exam was difficult to interpret, noted decreased pin prick behind the knees bilaterally but had no explanation for the complaints of severe low back pain R. 654, 661, 665; Dr. Paroda, a state agency physician examined Hinely in December 1998 and found he showed joint discomfort out of proportion to the physical findings, noted Hinely would act like he was going to fall, catch himself and not fall, found no evidence of muscle atrophy or wasting, found that muscle tone and strength were excellent throughout and bilaterally, could find no gait defect even though Hinely walked with a cane, found that Hinely could stand on one leg and walk heel-to-toe and that his *deep tendon reflexes were normal* R. 675-676; Dr. Gutman saw Hinely with respect to the results of the MRI she had previously recommended and, notwithstanding that the MRI showed a diffuse bulge at the C3-4 level with effacement of the subarachnoid space, she did not believe it or multiple sclerosis which she had ruled out accounted for Hinely's symptoms of back pain, neck pain and multiple symptoms R. 650-651; a February 1999 MRI showed minimal degenerative disc disease at multiple levels with loss of disc hydration and small posterior annular tear at the L4-5 level but no mention of nerve root compression; and Dr. Weinstein, a neurologist, examined Hinely in October 1999 on referral from Dr. Katiny and found *negative straight leg raising and no obvious weakness in the extremities* resulting in Dr. Weinstein's inability to account for Hinely symptoms particularly since the MRI showed only *minimal disc disease* and the x-rays were read as normal R. 249.

B.      With respect to Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours, the undersigned was unable to find and Hinely does not point to any diagnosis of spinal arachnoiditis by any of the multitude of physicians who examined or treated him or consulted in his behalf much less provide support for such a diagnosis by operative note or pathology report of tissue biopsy or the other acceptable alternative methods.

C.      With respect to Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b, there is no evidence in the record of medically acceptable imaging which shows lumbar spinal stenosis resulting in pseudoclaudication in Hinely. .

Generally, inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.) In this case, Hinely has the use of both hands and uses a cane. His medical records show that he was able to ambulate without the assistance of a device which required the use of both hands.

During the relevant period: January 1, 1997 through June 1, 2000, it cannot be denied that Hinely made multiple trips to hospital emergency care facilities and doctors offices complaining of severe pain, weakness and numbness in his legs, frequent falls, and in December 1999 Dr. Carson prescribed that Hinely continue to use a cane in his left hand. However, the undersigned cannot say that the ALJ's determination was without substantial evidentiary support.

Hinely's claim that the ALJ should have used listing 1.05C instead of listing 1.04 is misplaced. The Notice of Final Rules revising the musculoskeletal listings stated: "we will apply these final rules to the claims of applicants for benefits that are pending at any stage of our administrative review process, including those clams that are pending administrative review after remand from a Federal Court." The rules became effective on February 19, 2002. Hinely first filed his application for benefits on May 28,1998. The ALJ rendered a decision on March 6, 2001, finding Plaintiff was disabled as of June 1, 2000, but was not disabled at any time prior to that date. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Plaintiff sought judicial review in the United States District Court for the Northern District of West Virginia. On October 28, 2005 the Commissioner remanded the matter to an ALJ to conduct a new hearing on limited issues after the District Judge, by order dated September 28, 2005, adopted the report and recommendation of the undersigned dated January 31. 2005. The case was pending judicial review when the rules became effective and thereafter was pending ALJ determination when the changed rules were applied.

To the extent Hinely challenges the evidentiary basis in the record for the ALJ's stated reasoning with respect to Listings 1.02 and 1.03 for the period under consideration, the following criteria is relevant:

**1.02 *Major dysfunction of a joint(s) (due to any cause):*** Characterized by gross anatomical

deformity (e.g., subluxation[9], contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis[10] of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

1.03 *Reconstructive surgery or surgical arthrodesis[11] of a major weight-bearing joint,* with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

First, there is no evidence in the record that Hinely underwent any "reconstructive surgery or surgical arthrodesis[12] to any weight-bearing joint, with inability to ambulate effectively ... and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." Accordingly, there is no evidence suggesting Hinely met Listing 1.03.

Second, the following excerpts from the voluminous record is an example of the substantial evidence that was available to be considered and now supports the decision that listing 1.02 was not met for the period under consideration:

---

[9]Subluxation: "an incomplete or partial dislocation." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

[10]Ankylosis: "immobility and consolidation of a joint due to disease, injury, or surgical procedure. ... the union of the bones of a joint by proliferation of bone cells, resulting in complete immobility." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

[11]Arthodesis: "the surgical fixation of a joint by a procedure designed to accomplish fusion of the joint surfaces by promoting the proliferation of bone cells; called also artificail ankylosis." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

[12]Arthordesis: "the surgical fixation of a joint by a procedure designed to accomplish fusion of the joint surfaces by promoting the proliferation of bone cells; called also artificial ankylosis." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 27TH EDITION.

The x-rays, taken because of his complaints of right shoulder pain, leg pain in both legs, and back pain due to falling through the floor in his bathroom, showed "no radiographic evidence of acute fracture or dislocation" and fail to demonstrate any [sic] demonstrate of bony or soft tissue injury" to the left knee, foot and ankle. R. 1100-1011, 1167.

By report dated November 29, 1994 Dr. Merrill, Assistant Professor of Orthopaedic Surgery at the Medical University of South Carolina, noted Hinely's complaints of "some diffuse pain about the medial aspect" and "around the patella tendon region." Dr. Merrill noted "[o]n examination he has a negative Lachman's Test and there may be a very mild effusion. He has some tenderness around his tibial tubercle and the medial joint." As a course of action, Dr. Merrill recommended a MRI or a "repeat arthroscopy if for nothing else to give him a clean bill of health." R. 1172. The recommended MRI was performed on November 23, 1994 and was read to show "[t]he posterior horn of the lateral meniscus has an abnormal morphology and shows abnormally increased signal. This is indicative of a tear of the posterior horn of the lateral meniscus. The posterior horn of the medial meniscus shows abnormal signal characteristics likely representing post surgical changes without evidence of a tear." The remainder of the knee was normal. Radiographs of the right knee showed "no evidence of fracture, dislocation, or significant joint effusion." R. 1173-1183.

Hinely was admitted to the hospital on December 18, 1997, for acute intractable back pain. R. 618-619. He reported having fallen again. The examining doctor reported that Plaintiff was severely histrionic and uncooperative with range of motion testing due to reported pain. R. 622. Straight leg raising was positive at only five to ten degrees. Sensation to light touch and pinprick was intact, equal and symmetrical. The doctor noted questionable malingering. Plaintiff was admitted and treated with Demerol overnight. He was evaluated by physical therapy and was found to have pain out of proportion to his physical examination. R. 619. He was able to sit, stand and walk a few steps with much histrionic, but with no difficulty moving. He was discharged with a diagnosis of acute low back secondary to re-injury with histrionic overlay and chronic back pain history.

Hinely supplied records from Dr. Edith Milan covering the period between November 19, 1998 and December 3, 1998 and of Dr. Adnan Silk for September 17, 1998. The substance of the records was that both doctors saw and evaluated Hinely for his complaints of pain, numbness and loss of control of his lower limbs. Dr. Silk's objective findings included: no tilt in the spine; no motor weakness in Hinely's lower extremities; good flexion and extension of both legs; the dorsiflexion and plantar flexion are strong and symmetrical; the knee reflexes are active 2+ bilaterally and the ankle reflexes are active on the right and absent on the left; decreased sensation to pinprick in the posterior aspect of both legs; no Babinski's sign; able to walk without any difficulty.

Dr. Gutmann saw Hinely on December 1, 1998. Upon examination, strength muscle tone, and coordination were normal. R. 654. Plaintiff walked with a slow, antalgic gait.

Charles Paroda, D.O. examined Hinely for the State agency on December 2, 1998. R. 670-678. He noted Plaintiff showed joint discomfort with range of motion that appeared to be out of proportion to the physical findings. R. 675. He also noted that Hinely acted like he was going to fall several times, but would catch himself and not fall. Instead he "kind of stumbled." R. 675. There was no evidence of any muscle atrophy or wasting. Muscle tone was excellent throughout. He also had excellent strength bilaterally and complaints of severe pain in his legs and back were out of proportion to the physical findings. R. 675. Hinely walked with a cane, but Dr. Paroda could not detect a gait defect. Hinely was able to stand on one leg and walk heel-to-toe, but complained of pain and weakness in his legs. Deep tendon reflexes were normal.

In October 1999, Hinely began seeing Dr. Antoine Katiny, M.D. R. 250-251. Dr. Katiny referred Plaintiff to neurologist J. Weinstein, M.D. for evaluation. R. 249. An x-ray of Hinely's knee was normal.

In December 1999, Hinely was again referred to Dr. Carson for complaints of right knee pain. R. 260. X-rays showed mild early stress and degenerative changes. Dr. Carson opined that Hinely should continue to use a cane in his left hand.

A December 23, 1999 consultative examination by A. Sabio, M.D., revealed normal fine manipulative movements, normal sensory and motor function, and normal deep tendon reflexes. R. 257. Hinely's knees had reported tenderness, but full range of motion and no effusion. There was no ligamentous laxity. R. 255. There was no redness, heat or swelling.

Records from March, April and May 2000 reflect evaluation and treatment for complaints of pain, numbness, and tingling in Hinely's hands, conservative treatment with splinting and finally surgery for carpal tunnel syndrome. The surgery was performed with the initial effect of eliminating the pain, numbness and tingling in his hand and thumb. R. 1097-1098.

Accordingly, the undersigned finds the ALJ's determination that Hinely's knees, arms and shoulder conditions do not meet or equal listing 1.02 or 1.03 during the period under consideration is supported by substantial evidence in the record.

The undersigned's review of the record finds similar substantial evidentiary support for the

ALJ's decision with respect to Hinely's claims of impairments meeting the Musculoskeletal Listings of Listings 11.00, 11.04 and 11.14.

The undersigned finds that the ALJ's statement of reasons set forth at the top of page 6 of 10 of his decision substantially complies with the Court's requirement in <u>Cook</u>. It is the undersigned's job to review the record to determine if the conclusions of the ALJ are substantiated by that evidence."

As the Fourth Circuit stated in <u>Hays v. Sullivan</u>, 907 F.2d 1453 (4th Cir. 1990):

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. <u>*King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979)</u> ("This Court does not find facts or try the case *de novo* when reviewing disability determinations."); <u>*Seacrist v. Weinberger,* 538 F.2d 1054, 1056-57 (4th Cir.1976)</u> ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); <u>*Blalock v. Richardson,* 483 F.2d at 775</u> ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

The undersigned need not agree with the ALJ provided the ALJ's conclusions are supported by substantial evidence in the record. <u>Smith v. Schweiker</u>, *supra* at 345.

c.    Combination of Impairments

20 CFR 404.1526 requires: "if you have more than one impairment and none of them meets or equals a listed impairment, we will review the symptoms, signs and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment." Hinely complains that "[t]he ALJ did not consider the combination of impairments at Step 3." DE 14, p. 10.

In addition to 20 CFR 404.1526, 42 U.S.C. § 423(d)(2)(B) and 42 U.S.C. § 1382(c)(a)(3)(F)

41

provide:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process."

(Emphasis added). The Fourth Circuit held that the Commissioner must consider the combined effect of a claimant's multiple impairments and cannot fragmentize them. Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989) ("It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity."); DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983) (noting at page 150 that the most egregious error made by the ALJ was his "failure to analyze the cumulative or synergistic affect DeLoatche's various maladies have on her ability to work"). "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Walker, supra, at page 50.

The following excerpts from the ALJ's decision show that he did consider the severe impairments in combination, but correctly found that they did not meet a listing or require a finding of disability as they were taken into consideration in the reduced RFC:

> As found in the prior decision and affirmed by the federal court, the claimant's back pathology and mental impairments are severe. Furthermore, giving the claimant the maximum benefit of the doubt, the claimant's history of knee injuries and arthroscopic surgeries, peripheral neuropathy of the lower extremities, and bilateral carpal tunnel syndrome, in combination with his back pathology are also considered severe. R. 844.

> The Administrative Law Judge, though, finds that the longitudinal record does not support a severe shoulder impairment in the time frame under adjudication. ...

42

However, even though the claimant has no severe shoulder impairment standing alone, the Administrative Law Judge has considered it with the other severe impairments in combination and has fully accommodated any shoulder impairment that may have existed by reduction of the claimant's residual functional capacity to a sedentary level." R. 844.

The ALJ does not specifically state that the impairments considered in combination do or do not meet a listing. The ALJ simply took them under consideration and adjusted the RFC downward to sedentary to accommodate the impairments, even though it is apparent that he did not believe all of Hinely's complaints. R. 844.

For instance, the ALJ had the cross-examination testimony of Bell that adding a complete option to sit or stand as needed may reduce the sedentary jobs by 25%. R. 1198. He also had Bell's testifimony on cross examination that eliminating occasional squatting, kneeling or crawling would rule out the mail clerk job. R. 1198 and that elimination of prolonged or repetitive movements with the left arm and shoulder would affect the light jobs that required some standing but not the sedentary jobs. R. 1199. In response to Hinely's counsel's assertion that the individual had an uncorrected left hand carpal tunnel syndrome and was required to use the left hand to hold a cane when working and should not therefore stress that hand, the ALJ also had Bell's testimony it would not affect positions he had previously mentioned because those jobs don't require much gross grasping. R. 1199-1200.

While Hinely complains about the ALJ's failure, he does not offer any marshaling of evidence to establish that a combination of impairments meets or exceeds one or more of the listings.

In Hayes, 907 F.2d at 1456 (quoting Seacrist v. Weinberger, 538 F.2d 597 (4th Cir. 1976), the Fourth Circuit noted "it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of

nonpersuasion."

Hinely points to Dr. Carson's clinic notes of December 27, 1999. Dr. Carson opines permanent disability based on Hinely's back. Dr. Carson admits he does not have Hinely's past medical records. All of Dr. Carson's opinions are based on subjective historical information given to him by Hinely. The only objective information Dr. Carson had at his disposal was weight bearing x-rays taken of Hinely's right and left knees showing "6 millimeters of articular cartilage in both of the medial compartments of the right and left knees. No other gross deformity was noted." R. 260. Based on the evidence in the record, the undersigned and both of the ALJ's who presided over the administrative hearings concluded that Hinely's subjective complaints were in serious question and not credible. The undersigned's report and recommendation, adopted by the District Judge was not appealed by Hinely.

To send this case back again to have the ALJ perform the exercise Hinely erroneously argues Cook requires and match all the evidence the ALJ found on review of the medical record to the criteria of the each listing would be futile. That is simply not required by Cook. Even if it were, the outcome would be the same. In this case it is obvious from the record that the ALJ's decision with regard to the listings is supported by substantial evidence.

2.      Medical Expert Testimony

The regulations give the ALJ discretion whether the case calls for the use of a medical expert to establish the date of disability onset. SSR 83-20. Use of such a medical expert is not mandated by the regulations. HALLEX 1-2-5-34 provides: "An ALJ may need to obtain an ME's opinion, either in testimony at a hearing or in responses to written interrogatories, when: the ALJ desires expert medical opinion regarding the onset of an impairment." While HALLEX is not authoritative,

it is instructional to ALJ's and is to be followed by ALJ's.

The Commissioner correctly argues that SSR 83-20 is applicable where disability has been determined and the medical evidence of record is inadequate to pinpoint an exact date of onset. SSR83-20 *Onset in Disabilities of Nontraumatic Origin,* Note 3.

In the instant case, the ALJ determined Hinely was not disabled during the relevant time period and therefore a determination of an onset date was not necessary.

Accordingly, the undersigned finds no abuse of discretion in the ALJ's refusal to call a medical expert to assist in the determination of a disability onset date.

3.      Hypothetical Questions

The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, Chester v. Mathews, 403 F.Supp. 110 (D.Md.1975), and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. Stephens v. Secretary of Health, Education and Welfare, 603 F.2d 36 (8th Cir.1979).   In addition, the opinion of a vocational expert must be based on more than just the claimant's testimony--it should be based on the claimant's condition as gleaned from the entire record.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).

In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

In the instant case the ALJ limited Hinely to sedentary work in hypothetical questions to the

VE. R. 1205. Hinely complains in this appeal that the hypothetical questions were incomplete because they did not include his: "multiple musculoskeletal and neuropathic limitations", "sudden severe falls", "moderate limitations in the ability to sustain attendance punctuality and a normal workday/workweek", "chronic pain"and "interference in the use of the upper extremities in reaching with the dominant left arm at the shoulder and right non-dominant arm at the elbow." DE14, p.13-14.

While it is true that the ALJ did not specifically include each of the complained of limitations or effects in his hypothetical questions to the VE, counsel for Hinely did include them in his cross examination questions of the VE. R. 1205. Accordingly the questions to and the responses of the VE were available for consideration of the ALJ when he made his decision some months later. The ALJ stated in conclusion 5 of his decision that he carefully considered the entire record and found the following residual functional capacity: "able to perform a range of sedentary work; requires a sit/stand option; can perform postural movements occasionally, ... cannot climb ladders, ropes or scaffolds; requires a cane for ambulation; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; ... limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more than occasional interaction with others." R. 845. The ALJ explained his reasoning for the limitations he accepted and included in his RFC stating that he had considered all the symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence ..."; "considered opinion evidence" and concluded "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these

symptoms are not entirely credible." R. 845. He noted that there was "no significant evidence in the record that the claimant's manipulation has been affected to any significant extent by the bilateral carpal tunnel syndrome." He noted that the "peripheral neuropathy of the legs and knee problems are accommodated by a sit/stand option as well as the use of a cane and postural limitations." He noted that, in his opinion, "claimant had very little credibility" relying on a record "replete with histrionics and over exaggeration." He proceeded over the course of two pages of his decision to document his credibility ruling with specific examples from the medical record. R. 846-847. He explains that Dr. Katiny did not mention the shoulder, knee or peripheral diagnoses in his assessment dated January 20, 2000 and therefore the ALJ concluded that Dr. Katiny did not find those claimed conditions to be very limiting. R. 847. He explained he did not give much weight to Dr. Katiny's opinions because they were based on Hinely's subjective complaints and not on objective medical findings. R. 847.

The undersigned has reviewed the decision and the record of this case and concludes the ALJ's determination of credible limitations supported by the substantial objective evidence in the record; his discounting of the opinions and not completely credible subjective complaints of limitations; and his hypothetical questions to the VE which included Hinely's credible limitations substantiated by the reliable evidence of record were all supported by substantial evidence in the record and the ALJ was therefore entitled to rely on the VE's opinion testimony given in response to those substantiated hypothetical questions.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying that Plaintiff was disabled at any time between January 1, 1997, and June 1, 2000

and I accordingly recommend that Defendant's Motion for Summary Judgment be **GRANTED**, that Plaintiff's Motion for Judgment on the Pleadings be **DENIED**, and that this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Opinion, Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Opinion, Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Opinion, Report and Recommendation to counsel of record.

Respectfully submitted this 20th day of March, 2008.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE